**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TRANZACT TECHNOLOGIES, INC.,<br>doing business as FREEDOM LOGISTICS,<br><br>Plaintiff,<br><br>v.<br><br>FREEDOM LOGISTICS, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.: 07 CV 6597

Judge: Marvin E. Aspen

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Tranzact Technologies, Inc. doing business as Freedom Logistics ("Freedom"), by and through its attorneys, Sullivan Hincks & Conway, submits the following Memorandum in Support of Its Motion for Preliminary Injunction:

**INTRODUCTION**

On April 10, 1996, Tranzact Systems, Ltd. first began using the service mark "Freedom Logistics®" in interstate commerce throughout the United States in connection with its business as a transportation broker and third party logistics and technology company providing unique specialized services collectively described as the Freedom Logistics® Network. On December 9, 1997, Tranzact Systems, Ltd. registered its "Freedom Logistics" service mark with the United States Patent and Trademark Office. The registered Service Mark, attached to the Declaration of Michael Regan as Exh. B[1], covered the following commercial activities:

ARRANGING FOR THE TRANSPORT OF FREIGHT BETWEEN SHIPPERS AND CARRIERS; FREIGHT BILL AUDITING; REQUESTING FREIGHT TRANSPORT RATES FROM CARRIERS; AND, PROVIDING FREIGHT TRANSPORT RATES TO SHIPPERS, IN

---

[1] Exhibits B, C, D, and E, including two records from the United States Patent and Trademark Office, two records of the Tennessee Secretary of State, and a record of the Federal Motor Carrier Safety Administration, are public records that may be judicially noticed. See 28 U.S.C. § 201; New England Health Care Employees Pension Fund v. Ernst & Young, 336 F.3d 495, 502 (6th Cir.2003); County of Stanislaus v. Pacific Gas & Elec. Co., 1995 U.S. Dist. LEXIS 21411 (E.D. Cal. 1995) ("[d]ecisions of federal and state agencies may be judicially noticed.")

CLASS 35[2]....FREIGHT BROKERAGE; AND, TRANSPORT FORWARDING OF FREIGHT, IN CLASS 39[3]...

On September 12, 2003, Tranzact Systems, Ltd. assigned its service mark to Tranzact Technologies, Inc. (Decl. Regan, Exh. C.) From 1996 to the present day, Tranzact Technologies, Inc. f/k/a Tranzact Systems, Ltd. has consistently and without interruption used and depended upon the service mark "Freedom Logistics" in connection with the activities described above and more thoroughly addressed in the Declaration of Michael Regan to describe a unique and separate business model in the Tranzact Technologies, Inc. corporation.

On October 10, 2007, Freedom discovered for the first time that Freedom Logistics LLC ("Defendant") was using the Freedom Logistics® service mark in connection with many of the same activities described on Freedom's service mark registration.  A review of the records of the Secretary of State for the State of Tennessee reveals that Defendant, is a Tennessee domestic limited liability company formed in October 2003. (Decl. Regan, Exh. D.) Its principal office is located at 147 Transport Drive, Gordonsville, Tennessee.

Further inquiry revealed that on February 13, 2004, Defendant, obtained authority from the Federal Motor Carrier Safety Administration ("FMCSA") to operate as a broker of motor carriage throughout the United States. (Decl. Regan, Exh. E.) In obtaining that authority, the public records maintained by the FMCSA show that Defendant filed a Form BOC-3 with the FMCSA designating an agent for service of process in each and every of the 50 states, including in the State of Illinois.

According to information shown on only a few websites located to date, it is apparent that from as early as 2004 through 2007, unbeknownst to Freedom, Defendant operated as a broker of

[2] Class 35: Advertising; business management; business administration; office functions

[3] Class 39: Transport; packaging and storage of goods; travel arrangement

motor carriage from its Gordonsville, Tennessee location and later from a location in Lebanon, Tennessee.  Defendant today advertises in the Gordonsville, Tennessee allpages.com Yellow Pages, among many other websites. (Decl. Regan, Exh. F.)

A profile of Defendant, last updated March 27, 2007, appears on the city-data.com website for Gordonsville, Tennessee, (Decl. Regan, Exh. G) and identifies Defendant as a transportation broker, warehouse, and small cartage company.  Defendant advertises that it can move its customers' "truckload freight anywhere in the U.S" and notes that Defendant is a subsidiary of "K & K Trucking", a motor carrier and freight broker also located in Gordonsville, Tennessee.  It also appears that Defendant also advertises at the loadmax.com website which allows truckers nationwide to search for available loads for transport.  (Decl. Regan, Exh. H.)

In the second quarter of 2007, NAI Nashville Commercial Real Estate Services issued an industrial report reflecting that Defendant, using the service mark "Freedom Logistics", entered into a major lease transaction for warehouse space located at 402 Hartman Drive, in Lebanon, Tennessee. (Decl. Regan, Exh. I.)  A news report of the Defendant's lease of the warehouse incorrectly refers to Defendant as "Freedom Logistics® Network"… a service of Elmhurst, Illinois…based as Tranzact Technologies, Inc." this clearly confusing he Defendant with Freedom.  (Decl. Regan, Exh. R.)  Additionally, in June 2007, Defendant, joined the Lebanon, Tennessee chamber of commerce under the name "Freedom Logistics". (Decl. Regan, Exh. J.)

On October 11, 2007, Freedom sent a letter to Defendant in Gordonsville, Tennessee and in Lebanon, Tennessee demanding that Defendant cease and desist from using the registered service mark "Freedom Logistics" in any way. Freedom has heard no response. (Decl. Regan, Exh. L.)  Since then Freedom has received an inquiry from one of its customers asking whether

Defendant is known to Freedom, thus showing confusion on the part of Freedom's customers. (Decl. Regan, Exh. R.)

Defendant, by continuing to operate under the service mark used by Freedom since 1996 and registered by Freedom in 1997, is engaging in a continuing violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) and (c), by directly infringing on a registered service mark, causing a likelihood of confusion as to the origin of services provided and diluting Freedom's trademark.

## ARGUMENT

The Federal Lanham Act, 15 U.S.C. § 1116, permits a Federal District Court to issue an injunction to prevent the violation of any right of a registrant of a service mark registered with the United States Patent and Trademark Office or to prevent a violation of 15 U.S.C. § 1125(a). Furthermore, 15 USC § 1125(c) authorizes an injunction to issue where a person is wrongfully diluting another's trademark.  In order to prevail on its motion for preliminary injunction, Freedom must demonstrate (1) a likelihood of success on the merits, (2) an inadequate remedy at law and irreparable harm if the injunction does not issue, (3) that the harm suffered by Freedom if the injunction does not issue exceeds the harm that will be suffered by Defendant if it does, and (4) the effect that granting or denying the injunction will have on third parties.  Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth., 100 F.3d 1287, 1292 (7th Cir. 1996); Meridian Mutual Insurance Company v. Meridian Insurance Group, Inc., 128 F.3d 1111, 1114 (7th Cir. 1997).  The Declaration of Michael Regan, attached hereto, in addition to facts contained in public records clearly establish each of the above-described elements.

### I.    Likelihood of Success - Infringement

A likelihood of success exists if the party seeking injunctive relief shows that it has a better than negligible chance of succeeding on the merits.  Meridian, 128 F.3d at 1114. To

demonstrate likelihood of success on the merits, Freedom must establish that it has a protectable mark and that a likelihood of confusion exists between the marks. <u>Meridian</u>, 128 F.3d at 1115; <u>American Society of Plumbing Eng. v. TMP Publishing, Inc.</u>, 109 Fed. Appx. 781, 785 (7th Cir. 2004). Since registration of its "Freedom Logistics®" mark by Freedom is *prima facie* evidence of a protectable mark, this Court need only resolve whether there is a likelihood of confusion. <u>See</u> <u>Meridian</u>, 128 F.3d at 1115.

In the Seventh Circuit, the court considers seven factors to determine likelihood of confusion. No single factor is dispositive and a court may assign varying weights to each of the factors: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant attempted to palm off his product as that of the plaintiff. <u>Meridian</u>, 128 F.3d at 1115 quoting <u>Smith Fiberglass Prods., Inc. v. Ameron, Inc.</u>, 7 F.3d 1327, 1329 (7th Cir. 1993). Freedom has a "better than negligible" chance of showing a likelihood of confusion created by Defendant's infringement on Freedom's "Freedom Logistics®" service mark.

As to the first two factors, the infringing service mark used by Defendant is identical to the "Freedom Logistics®" service mark used by Freedom continuously throughout the United States since 1996 and registered on the principal register in 1997. Additionally, the services held out to the public by Defendant are identical to a subset of the services Freedom advertises and provides. Defendant advertises itself as a freight broker capable of moving its customers' "truckload freight anywhere in the U.S." Similarly, Freedom provides freight brokerage of truckload motor carriers throughout the United States as part of its complete service offering. Additionally, Freedom's "Freedom Logistics®" registered service mark states that it is for

"Arranging for the transport of freight between shippers and carriers…" and for "Freight brokerage; and transport forwarding of freight", among other things.  In other words, not only are the names the same, but the services provided by Defendant and a subset of services provided by Freedom, operating under its "Freedom Logistics®" service mark, are the same. Defendant's infringement diminishes the essential goodwill developed by Freedom signified by the mark that represents Freedom's business offering to Freedom's customers all over the United States.

The geographic areas covered by Defendant and Freedom, operating under the "Freedom Logistics®" service mark, are also identical. Both companies advertise nationwide freight brokerage.  For example, it appears that Defendant advertises on the loadmax.com load board which advertises available loads for truckers nationwide.  It has also appointed agents for service of process in each and every one of the United States, thus demonstrating an intention to operate in all 50 states.  Additionally, Defendant's profile at the city-data.com website for Gordonsville, Tennessee identifies Defendant as a transportation broker, a warehouse, and a small cartage company capable of moving its customers' "truckload freight anywhere in the U.S."

The need for an injunction in this matter is further demonstrated beyond question by the nature of the freight brokerage aspect of Freedom's business.[4]  In most instances involving simple freight brokerage of motor carriage, the customer will simply telephone a freight broker to obtain a rate and will look no further than the name.  In other words, for the simple motor carrier broker operations of Freedom, it would be very likely for a customer to see the name "Freedom Logistics®", simply associate it with the quality service and national reputation of Freedom and place a phone call based upon that name to secure brokerage services.

---

[4] Note that as described in detail elsewhere, Freedom's business includes not only a straight freight brokerage of motor carriage business but also includes several other Logistics Services described in more detail in the Declaration of Mike Regan and the Complaint filed in this matter.

6

Freedom's "Freedom Logistics®" service mark is particularly strong. To determine the strength of a mark, several factors are considered including the type of mark, whether it has been subject to wide and extensive advertisement, the extent of third party use, and whether third parties have used similar marks. Telemed Corp. v. Tel-Med, Inc., 588 F. 2d 213, 219 (7th Cir. 1978); McGraw-Edison Co. v. Walt Disney Prods., 787 F.3d 1163, 1171 (7th Cir. 1986).

The "Freedom Logistics®" mark used by Freedom is clearly more than a merely descriptive mark. The mark is used to uniquely identify Freedom in the marketplace and is used to indicate additional and unique niche services that are widely advertised as shown in the Declaration of Mike Regan. The "Freedom Logistics®" mark has generated significant revenues for Freedom showing significant goodwill for the Mark. For example, the mark generated $37,929,570.07 in revenue from general brokerage operations in 2006 and an additional $41,796,466.13 in revenue from its other Logistics Operations in 2006. (Decl. Regan, Exh. O.)

Additionally, Freedom has repeatedly and vigorously defended its right to the service mark against third party encroachment over the years including taking action against separate infringing parties in Pennsylvania, Ohio and South Carolina, among others. (Decl. Regan, incl. Exhs. M and N.) Freedom has actively worked to prevent competing entities from using the mark. Furthermore, the Declaration of Michael Regan shows unequivocally that Freedom's "Freedom Logistics®" mark is well-known throughout the transportation industry and that Freedom has invested over $1 million in developing and maintaining the "Freedom Logistics®" mark. Freedom's use of the domain name www.freedomlogistics.com shows that it has subjected the mark to wide and extensive advertisement.

The next factor to be considered is whether Defendant's actions have caused actual confusion. While "evidence of actual confusion is not essential to a finding of a likelihood of

confusion", Plaintiff nonetheless alleges such actual confusion on the part of at least one consumer of freight brokerage services. See Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 464 (7th Cir. 2000).  Attached to the Declaration of Mike Regan are two e-mails from Teri Ferraro, a customer of Freedom.  The e-mails reflect her apparent confusion by a contact she received from Defendant as shown by her inquiry as to whether Freedom had any connection with the person who had contacted her claiming to represent "Freedom Logistics".   (Decl. Regan, Exh. R.)

Other substantive evidence shows actual confusion beyond any doubt.  Note a news report from the NashvillePost.com attached to the Declaration of Michael Regan as Exh. K.  In a "Real Estate Notes" article dated September 27, 2006, an announcement reports that "Freedom Logistics Network…a service of Elmhurst, IL-based Tranzact Technologies Inc." entered into an agreement to lease a Gordonville, Tennessee warehouse.  This report clearly confuses Freedom, a company that has never leased a location in Gordonsville, Tennessee, with Defendant, who did lease warehouse space in the Gordonville/Lebanon, Tennessee area.  Furthermore, beginning in 2005, Freedom has received several inquiries from trucking companies and credit reporting agencies concerning the late payment of freight bills which had been billed to "Freedom Logistics®" on shipments for which Freedom had no involvement.

The final factor to be considered is whether Defendant intended to palm off its product as that of Freedom, operating under the "Freedom Logistics®" service mark.  Intent in this situation refers to the intent to confuse customers. Meridian, 128 F.3d at 1120.  Deliberate use of a competitor's trademark shows an intent to divert business by misinforming customers.  Sutton Cosmetics, Inc., v. Lander Co., 455 F.2d 285 (2nd Cir. 1972). Defendant's actions reflect just such an intent.  As described above, on October 11, 2007, Freedom delivered a communication

to Defendant, demanding that Defendant stop using the Federally-registered "Freedom Logistics®" service mark in commerce.  Notwithstanding this fair opportunity to cease its infringement on an existing, registered service mark, Defendant ignored Freedom's demand and continues with business as usual clearly showing an intent to confuse customers.

Defendant's knowledge of its infringement on Freedom's existing "Freedom Logistics®" service mark unquestionably predates Freedom's October 11, 2007 letter.  A simple Google search of the term "Freedom Logistics®" shows that the first five hits all lead to websites maintained by Freedom, including a site with the registered domain name www.freedomlogistics.com.  Defendant was internet savvy enough to post a profile of its business on-line at city-data.com and to presumably advertise on a load-sharing website loadmax.com.  That alone shows Defendant knew that a nationally based freight brokerage and third party logistics company known as "Freedom Logistics®" existed.  Furthermore, Defendant's principals knew about "Freedom Logistics®" because they had done business with Freedom Logistics® before.  As shown on the city-data.com website, Defendant advertises itself as being a subsidiary of K&K Trucking, Inc.  Freedom's records indicate that from 2005 through 2007, Freedom paid K&K Trucking, Inc. approximately $500,000 in freight bills for one of its customers.  (Decl. Regan, Exh. S.)  They must have known about Freedom.

Because each of the seven factors required to demonstrate likelihood of confusion weighs in Freedom's favor and because Freedom has registered its "Freedom Logistics" service mark, Freedom has a "better than negligible" chance of succeeding on the merits.

## II. Likelihood of Success – Trade Dilution

Freedom also has a likelihood of success on its claim for trade dilution.  In order to prevail on a dilution claim, Freedom must prove (1) that its "Freedom Logistics" service mark is

famous, (2) that Defendant adopted the service mark after the mark became famous, (3) that Defendant diluted the mark, and (4) that Defendant's use of the service mark is commercial and in commerce.  Syndicate Sales, Inc. v. Hampshire Paper Corp., 192 F.3d 633 (7th Cir. 1999); AM General, 311 F.3d at 811-12.  Dilution differs from trademark infringement as it does not require a showing of consumer confusion as to source.  AM General, 311 F.3d at 812.

In the brokerage of motor carrier services industry in which both Freedom and Defendant participate, Freedom clearly has a famous mark.  Cf. Syndicate Sales, 192 F.3d at 641 (holding that fame in a niche market is sufficient for a federal dilution claim.) In determining whether a mark is famous, 15 U.S.C. § 1125(c)(1) advises the Court to consider all relevant factors, including the following: (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.  (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark. (iii)

The extent of actual recognition of the mark. (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Freedom has advertised and publicized its "Freedom Logistics®" mark as it relates to both general freight brokerage of motor carrier service and as it relates to the "Freedom Logistics" transportation marketplace continuously throughout the United States since the "Freedom Logistics®" mark was registered beginning in 1997.  The mark has been advertised and publicized nationwide by registering the domain name www.freedomlogistics.com and Freedom Logistics has been advertised at numerous trade shows including at the annual meeting of the National Industrial Transportation League, the principal association for shippers in the United States. (Decl. Regan, Exhs. O and P.)

Operating under the "Freedom Logistics®" name, Freedom has over 1000 motor carriers with whom it has a contract for general freight brokerage of motor carrier service under the Freedom Logistics brokerage authority.   Furthermore, the "Freedom Logistics®" Network consists of approximately 40 motor carrier-customers and 106 member shipper-customers located across the United States who use Freedom's proprietary transportation marketplace and other Logistics Services.   Altogether, from 2002 through 2006, Freedom has earned $209,788,635.96 in revenue directly attributable to the "Freedom Logistics®" transportation marketplace created by Freedom and an additional gross revenue of $125,720,320.78 attributable solely to general freight brokerage of motor carriage business from 2004 to 2006.  The "Freedom Logistics®" service mark is well recognized in the industry as a unique marketplace for the purchase of transportation by motor carrier and as a general freight brokerage.   Freedom's contracted motor carrier-customers include such easily recognized national carriers as Central Transport, FedEx Freight, Roadway, UPS Freight, USF Holland, and Yellow Transportation.  It is clear that, in the transportation brokerage industry, Freedom has enjoyed a famous mark for a long period of time.

Freedom's service mark clearly became famous before Defendant adopted Freedom's service mark "Freedom Logistics®".   The Tennessee Secretary of State records reveals that Defendant did not incorporate until October 21, 2003, more than six years after Freedom registered its service mark with the USPTO.  Furthermore, Defendant did not obtain its authority to operate as a broker of motor carriage until February 13, 2004.  Finally, a review of the information available on the internet, including reports that Defendant leased a warehouse in Lebanon, Tennessee, suggests that Defendant did not open its own location operating under the

"Freedom Logistics" name until late 2006 or early 2007, well after Freedom's service mark became famous.

Defendant's actions have diluted and threaten to further dilute Freedom's "Freedom Logistics®" service mark that is registered on the principal register. Evidence of a mere likelihood of dilution is sufficient to establish this element and proof of actual dilution is not required. Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456 (7th Cir. 2000). To find dilution, the Court should consider (1) the renown of the allegedly diluted mark and (2) the similarity of the marks at issue. Eli Lilly, 233 F.3d at 469.

As described above, Freedom's "Freedom Logistics®" service mark has gained renown in the transportation brokerage of motor carriage industry whose general brokerage service is utilized by hundreds of shippers and involves separate contracts with over one thousand carriers. "Freedom Logistics®" has gained further renown in the industry by developing and maintaining a unique transportation and logistics marketplace involving over 100 shipper customers as well as many of the largest nationwide motor carriers in the United States such as FedEx Freight, UPS, and Roadway. Furthermore, Freedom's "Freedom Logistics®" service mark is identical to the mark used by the Defendant who, like Freedom, uses the "Freedom Logistics®" service mark in connection with general freight brokerage of motor carriage service. Clearly, Defendant's mark dilutes the famous mark created and defended by Freedom.

Based upon the foregoing, Freedom certainly has a "better than negligible" chance of succeeding on the merits of its trade dilution claim.

### III.    Irreparable Harm/Inadequate Remedy

Freedom has no adequate remedy at law and will suffer irreparable harm if this injunction does not issue. Injury to Freedom's goodwill is recognized as irreparable harm for which there is

no adequate remedy at law. <u>Gateway Eastern Ry. Co. v. Terminal RR Ass'n of St. Louis</u>, 35 F.3d 1134, 1140 (7th Cir. 1994). The risk of future erosion of goodwill where the defendant's allegedly infringing product is inferior permits a preliminary injunction to issue. <u>Pic Design Corp. v. Bearings Specialty Co</u>., 436 F.2d 804, 809 (1st Cir. 1971). Where infringement and trade dilution claims exist, there is a presumption that there is a threat of "irreparable injury for which there is no adequate remedy at law." <u>Freudenberg Household Prods. LP v. Time Inc.</u>, 2006 U.S. Dist. LEXIS 20774, *24 (N.D. Ill. 2006) <u>quoting</u> <u>AM Gen. Corp. v. Daimlerchrysler Corp.</u>, 311 F.3d 796, 805 (7th Cir. 2002).

Defendant's wrongful use of Freedom's "Freedom Logistics®" service mark presents a very clear threat of eroding Freedom's goodwill. Freedom has invested over $1 million developing its mark and significant amounts more developing technology to support its "Freedom Logistics® Network" and Freedom Logistics® general freight brokerage activities. It has also spent significant amounts of money advertising its services, including maintaining a fully interactive internet domain acting as a marketplace and permitting members of the "Freedom Logistics®" Network to obtain logistics and freight brokerage services. While some of the services provided by Freedom and Defendant are superficially the same, i.e. general motor carrier freight brokerage, the services made available by Freedom, through the "Freedom Logistics®" service mark are clearly more sophisticated especially in the area of software support that is at the center of all sophisticated freight broker operations. Freedom has been in business far longer, has a larger sales and support staff, and can provide sophisticated logistics management functions far and away above the simple freight brokerage offered by Defendant by its posting on load board offerings. Stated differently, Freedom clearly provides a superior

service that will be eroded if Defendant, with its inferior product, is permitted to continuing trading on Freedom's goodwill.

Furthermore, the evidence shows that Freedom has already suffered some diminution of its goodwill in light of the fact that it has received collection attempts on late bills invoiced to "Freedom Logistics" for which Freedom was not involved. Freedom clearly shows it will suffer an irreparable harm for which no adequate remedy at law is available.

**IV.     Balance of Harms**

The harm to Freedom in not granting the injunction clearly outweighs any possible harm to Defendant. Freedom has spent substantial sums over the years defending its service mark and has built a strong mark. Any erosion of that mark subjects Freedom to further erosion in the future. Its goodwill and reputation as a leader in the industry are clearly at stake.

Defendant, on the other hand, will not suffer any harm. On the website city-data.com, Defendant advertises itself as a subsidiary of K&K Trucking, Inc., a well-established company located in the Lebanon-Gordonsville, Tennessee area. Like Defendant, K&K Trucking also has freight broker authority. Since Defendant already advertises itself as an affiliate of K&K Trucking, and K&K Trucking has brokerage authority, it would suffer little to no harm to operate under that name. The only cost that will be incurred by Defendant will be to correct its registrations with the Tennessee Secretary of State and the FMCSA, it yellow-pages advertisements, its company profiles on the internet, and any other advertisements that are out in the public domain.

**V.     Effect of Injunction on Third Parties**

By issuing the Injunction requested, this Court will be protecting the general shipper and motor carrier public. Freedom has spent well over ten years developing the technology and

systems required to create and manage a unique transportation marketplace now identified as the "Freedom Logistics®" Network, as well as provide high quality freight brokerage and other Logistics Services under the "Freedom Logistics" service mark.  Consequently, the shipper and motor carrier public has come to expect high quality, unique services when shippers and/or motor carriers contact and contract with Freedom as well as consistent timely payment. Defendant's wrongful use of Freedom's "Freedom Logistics®" service mark creates the likelihood that customers will end up with inferior service that fails to meet expectations, or with differing freight payment practices as well as an increased possibility of late payment of outstanding freight bills.

Conversely, there will be virtually no ill-effect on third parties if Defendant is required to abandon the infringing use of Freedom's "Freedom Logistics®" service mark.  As shown in its company profile on city-data.com, Defendant already holds itself out as and associates itself with K&K Trucking, a motor carrier that also has its own freight broker of motor carriage authority. In sum, the effect on third-parties if the injunction were to issue would clearly be positive for consumers.

## CONCLUSION

For the reasons as stated herein and in the Declaration of Michael Regan, Tranzact Technologies, Inc. d/b/a Freedom Logistics, respectfully requests this honorable Court grant its Motion for Preliminary Injunction as requested.

Respectfully submitted,

TRANZACT TECHNOLOGIES, INC.
d/b/a FREEDOM LOGISTICS

By: /s/ Matthew P. Barrette            .
        One of Its Attorneys

Daniel C. Sullivan
Matthew P. Barrette
Sullivan Hincks & Conway
120 W. 22nd Street, Suite 100
Oak Brook, Illinois 60523
(630) 573-5021